WHITE PINE LUMBER CO. v. MANUFACTURERS' LUMBER CO.

1. CONTRACTS—RESCISSION—MEETING OF MINDS—RECOUPMENT.

Where plaintiff furnished part of certain lumber culls contracted to defendant and failed to furnish the balance because he claimed defendant had rescinded the contract, in a suit for the purchase price of the culls furnished wherein defendant sought to recoup damages for breach of contract, claiming that what he said did not amount to a rescission of the contract, it was necessary to show a meeting of minds to establish the rescission; the issue was a proper one for the jury, as to whether the words employed in the conversation amounted to an absolute rescission as contended by plaintiff or included a condition as claimed by the opposite party.

2. EVIDENCE—ADMISSIONS—CONTRACTS.

Evidence of statements made and written after the alleged

rescission, whereby the buyer attempted to explain or qualify his conversation relating to rescission and to induce the other party to perform, was competent to show the real intent and understanding of the person or agent who made the attempt to rescind, and, *held*, to present an issue for the jury on the issue of the rescission.

3. SAME—NEW TRIAL—VERDICT.

*Held*, also, that the verdict of the jury finding a rescission was supported by competent evidence and should not be set aside on error.

4. SAME—ADMISSION—CROSS-EXAMINATION.

After interrupting a witness in the act of answering and preventing a complete reply to the question, appellant was not warranted in claiming that the incomplete sentence was an admission in favor of the cross-examining party.

5. APPEAL AND ERROR—RECORD—TRANSCRIPT OF TESTIMONY.

A certified transcript of the evidence taken in shorthand by the court stenographer, who died after trial, was properly used to prepare the record on appeal, where another stenographer, with the assistance of appellee's attorney, was able to make a record satisfactory to the trial court, who certified to the correctness of the transcript, and a new trial was unnecessary.

6. SAME—EXCEPTIONS.

The correctness of a bill of exceptions is to be determined by the trial judge and his certificate is ordinarily conclusive on the appellate court.

Error to Wayne; McDonald, J., presiding. Submitted January 18, 1916. (Docket No. 26.) Decided June 1, 1916.

Assumpsit by the White Pine Lumber Company, a corporation, against the Manufacturers' Lumber Company, a corporation, and another, for the price of certain lumber. Judgment for plaintiff. Defendants bring error. Affirmed.

*Frank W. Atkinson* (*Moloney & Atkinson,* of counsel), for appellants.

*Oxtoby & Wilkinson,* for appellee.

In March, 1911, plaintiff made two contracts with the Manufacturers' Lumber Company, one of the defendants, for the sale and delivery of certain lumber to that company. One of these contracts was for the sale of the culls that had been cut at plaintiff's mill on Blind river, Ontario, during the year 1910, and the other was for the sale of such culls as had been cut and those that were to be cut at the mill during the year 1911. Afterwards the Manufacturers' Lumber Company assigned its interest in these contracts to the Yeomans-Diver Company, the other defendant. There does not seem to have been any dispute over the 1910 culls, but when the barge Ida Keith reached Detroit, some time in August, 1911, with the first consignment of the 1911 culls, a controversy over these did arise between the parties, with the result that the rest of the 1911 culls were sold by the plaintiff to other parties. The defendants claim that the controversy amounted simply to a complaint about the width of the 1911 culls; while plaintiff insists that it terminated in a rescission of the contract as to all of that year's culls yet remaining at Blind river. This action was eventually brought by plaintiff to recover a balance of $4,683.74 remaining unpaid for such culls as were actually delivered, and it is admitted by defendants that such balance is due to plaintiff for those culls. But the defendants, in turn, denying any rescission of the contract, seek to recoup damages to the amount of $3,196.96 for the failure of plaintiff to deliver the balance of the culls cut in 1911. The entire contest at the trial was in relation to defendants' attempted recoupment, and this was made to depend upon whether the contract as to the undelivered culls had or had not been rescinded. The jury found that there had been a rescission, and returned a verdict for the full amount claimed by the plaintiff. The defendants bring the case to this court.

Person, J. (*after stating the facts*).   The contro-
versy between the parties relates principally to the al-
leged rescission of the contract as to the undelivered
culls.   Such rescission, if it took place, grew out of a
conversation over the telephone between Fred H. Yeo-
mans, then vice president and general manager of the
Yeomans-Diver Company, and Daniel E. Wells, vice
president of the plaintiff company, and in charge of
its Detroit business.   The authority of these gentlemen
to bind their respective companies to such rescission is
not questioned, nor is the fact denied that they had the
conversation referred to about the balance of the culls.
It is also conceded that, following the conversation,
Mr. Wells acted upon the assumption that the contract
had been canceled, and sold the remaining culls to
other parties.   The defendants, however, contend that
Mr. Wells had no right to give such construction to
anything that Mr. Yeomans said, and that there was
no evidence in the case from which the jury were au-
thorized to find that Mr. Yeomans consented to, or
intended, any rescission.

Testifying in the case, Mr. Yeomans says that his
talk about canceling the contract as to the balance of
the culls was merely conditional; that he was com-
plaining to Mr. Wells about the width of this first ship-
ment, and that—

"in my conversation with Mr. Wells he stated that if
we did not like the lumber we could cancel our con-
tract.   I told Mr. Wells that lumber was not running
wide width and we could not use that narrow stuff.   He
wanted to know if I wanted to cancel the contract.   I
told him that, if it all run that narrow width, I cer-
tainly did."

It seems to be conceded that these culls about which
Mr. Yeomans was complaining were not a fair sample
of the year's cut, and that those remaining on com-
plainant's docks at Blind river averaged a greater

width than those first brought down. Mr. Yeomans further says:

"I mean to state it this way: We would cancel if we had to take all five-inch; cancel, we never said we would cancel the contract, the lumber we were supposed to get; on the four-inch strips, yes, but not on that contract."

Had the jury accepted this version of the conversation, they could not have found that it amounted to either a request or a consent that the contract be rescinded as to the balance of the culls. It was conditioned upon the fact that those were as narrow as the culls that had been brought down, and this was not true. The rescission of a contract as much requires the meeting of minds as does the making of a contract. In a note to *Bryant* v. *Isburgh,* 74 Am. Dec. 657, it is said:

"All executory contracts may be rescinded by the parties to them if they continue interested until the agreement to rescind is made." *Johnson* v. *Reed,* 9 Mass. 78 (6 Am. Dec. 36); *Blood* v. *Enos,* 12 Vt. 625 (36 Am. Dec. 363).
"It has been said that courts require as clear evidence of waiver of a contract by mutual assent as of the contract itself. *Carolan* v. *Bratazon,* 3 Jo. & Lat. 200; *Dial* v. *Crane,* 10 Tex. 444; *Quincy* v. *Tilton,* 5 Greenl. (Me.) 277. On the other hand, it is said that an agreement to rescind may be shown by such circumstances, or by such a course of conduct, as clearly evidences the intention of the parties that it shall so operate. *Wheeden* v. *Fiske,* 50 N. H. 125; *Green* v. *Wells,* 2 Cal. 584; *Robinson* v. *Page,* 3 Russ. 114; *Murray* v. *Harway,* 56 N. Y. 337."

Mr. Wells, however, does not agree with Mr. Yeomans as to what was said between them. He testifies:

"I think that Yeomans saw the narrow lumber coming first, and that he was discouraged on the width, and was afraid that the rest was going to be all the same size, so he called us up and said he wanted to

cancel; the lumber was too narrow for his use.  *  *
*   As soon as Mr. Yeomans told me that he could not
use any more of our lumber, I said: 'All right, Fred;
I will try to place it somewhere else.  People have been
wanting that lumber for some time, and I will see if
they can use it and let you know.'  *  *  *  He
[Yeomans] said he could not use the lumber."

If this rendering of the conversation is correct, there
was a distinct request by Mr. Yeomans that his com-
pany be relieved of its obligation to take the balance
of the culls; an offer, in other words, to rescind the
contract as to such culls.  And this offer was accepted
by Mr. Wells, not in words at the time, but by an act,
that of making another disposition of them in compli-
ance with Mr. Yeomans' request.  Some light is thrown
upon the probable nature of the conversation, and upon
what both men understood its import to be, by their
subsequent conduct, not only by that of Mr. Wells in
making another sale of the lumber, but also by that
of Mr. Yeomans.  The latter, a few days after his con-
versation with Mr. Wells, called up Mr. Conely, the
broker who had negotiated the contract between the
parties, and Mr. Conely gives the talk which he then
had with Mr. Yeomans, as follows:

"He called me up on the telephone and told me he
couldn't use that lumber; it was too narrow.  I told
him I didn't think so.  I had just come from the boat,
and it was a good lot of lumber.  There was a lot of
short lumber on the Keith which made it look narrow
—a lot of 1910 shorts.  *  *  *

"*Q.* Did he say anything to you in regard to his can-
celing the balance of the contract?

"*A.* I don't know as he used the word 'cancel,' but
he said he told Mr. Wells that he wouldn't receive any
more of the lumber.

"*Q.* What did you tell him?

"*A.* I told him that he had made a mistake.  I had
seen the culls at Georgian Bay, and they were a nice
lot of mill culls.

"*Q.* And what other talk did you have with him?

"*A.* He told me to get hold of Dan and straighten the thing out.

"*Q.* Did you see Mr. Wells after that?

"*A.* No; I talked with him over the phone.

"*Q.* And what talk did you have with Mr. Wells over the phone?

"*A.* I told him Mr. Yeomans didn't want to cancel that order, and Mr. Wells told me that he had optioned the lumber to Lowrie & Robinson, and that he was well satisfied to let Lowrie & Robinson have the lumber."

Following this interview with Mr. Conely, and on the 21st day of August, 1911, Mr. Yeomans, for his company, wrote Mr. Wells as follows:

"As per our telephone conversation, stating that we do not wish to cancel our contract with you for lumber this year, which was to be about 800 M ft. of 4/4, 500 M ft. of 5/4 and 300 M ft. of 6/4 and about 100 M ft. of 8/4, we trust you will reserve this lumber for us and be able to start delivery to us in about three weeks.

"This order does not include 125 M ft. of 5/4, which we understand is now being loaded for us."

At the same time Mr. Yeomans wrote Conely & Bailey, the brokers, that he had notified plaintiff that defendants did not wish to cancel the order for lumber. It is true that Mr. Yeomans does not admit in full the statements attributed to him by Mr. Conely, and he says that he wrote the letter to Mr. Wells "for fear they would make some excuse of the cancellation," but the conversation and the letters had some bearing on the question of Mr. Yeomans' understanding of the import of his talk with Mr. Wells, and were for the consideration of the jury.

We think there was evidence justifying the trial court in submitting the question of rescission to the jury, and that their verdict should not be set aside as against the weight of the evidence.

In the course of the examination of Mr. Wells by counsel for the defendant the following took place:

"*Q.* Now, if Yeomans had canceled the contract, you would want your records at Blind river to show the facts, wouldn't you?

"*A.* Well, Mr. Yeomans didn't cancel—

"*Q.* Answer that 'Yes' or 'No.' Do you or do you not want your records to show the facts at your mills?"

Now, counsel for the defendants insist that we should accept this partial answer by Mr. Wells as a full and complete admission that the contract was not canceled. This we cannot do, as it is impossible to know what Mr. Wells' completed answer would have been. It is hardly fair for counsel to interrupt a witness in the middle of a sentence and to then insist that the fragment of an answer be taken as a completed whole.

At the trial a portion of the testimony was taken by a stenographer, who afterwards died without having furnished a transcript thereof. Before settling the bill of exceptions the notes of the testimony so taken were placed in the hands of Mr. Daniel, another court stenographer, who transcribed them, but with some help from the counsel for the plaintiff. Mr. Daniel makes an affidavit that he was able to read the notes, and that he believes the transcript made by him to be correct. This testimony was incorporated in the bill of exceptions, and the circuit judge before whom the case was tried not only signed the bill, including such testimony, but certifies particularly that the transcript made from the notes of the deceased stenographer was true, complete, and correct. It is urged by counsel for defendants that this transcript should not have been used, especially as counsel for plaintiff assisted somewhat in its preparation, and that a new trial should have been granted by the circuit judge because of the death of the stenographer who took the minutes. Counsel, however, do not point out nor suggest any mistake in the transcript, and the use of it

was not erroneous. The accuracy of a bill of exceptions is to be determined by the trial judge, and his certificate is ordinarily conclusive.

It being determined that the question of rescission was properly left with the jury, the other errors assigned become immaterial.

The judgment will be affirmed.

STONE, C. J., and KUHN, BIRD, MOORE, STEERE, and BROOKE, JJ., concurred. OSTRANDER, J., did not sit.